```
 1  CARMEN A. TRUTANICH, City Attorney
    KELLY MARTIN, Managing Assistant City Attorney
 2  D. TIMOTHY DAZE
    Deputy City Attorney (SBN 76203)
 3  CITY OF LOS ANGELES,
    OFFICE OF THE CITY ATTORNEY
 4  1 World Way
    P.O. Box 92216
 5  Los Angeles, California 90009-2216
    Telephone:  (310) 646-3260
 6  Facsimile:  (310) 646-9617

 7  JOHN M. WERLICH (SBN 48855)
    Law Offices of John M. Werlich
 8  1563 Shadowglen Court
    Westlake Village  CA 91361
 9  Telephone:   (805) 236-1694; Facsimile: (809) 379-4408

10
    Attorneys for Defendants
11
    UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
12
    WESTERN DIVISION
13
```

| | |
|---|---|
| INTERNATIONAL SOCIETY OF KRISHNA CONSCIOUSNESS OF CALIFORNIA, INC., a California nonprofit, religious, corporation; and EMIL BECA, one of its individual members,<br><br>             Plaintiffs,<br><br>     vs.<br><br>THE CITY OF LOS ANGELES, a California Municipal Corporation, STEPHEN YEE, Airport Manager, and BERNARD J. WILSON, Chief of Airport Police,<br><br>             Defendants. | No. 2:97-CV-03616 CBM<br><br>**CITY'S RESPONSE TO PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>**JUDGE CONSUELO B. MARSHALL**<br><br>Date:<br>Time:<br>Place:     Courtroom 2 |

If one were reading ISKCON's Memorandum[1] for the first time, it would be easy to overlook the reality that this litigation has been plodding along for 13 years and that during that time the parties filed over 150 mostly uncontested declarations

---

[1] "Memorandum of Law in Support of Plaintiffs' Application for Temporary Restraining Order and Order to Show Cause." Hereafter "ISKCON Memorandum" or "Memorandum."

CITY'S RESPONSE TO PLAINTIFFS' REQUEST FOR TRO

1

in the underlying case and in the related case [No. 2:03-CV-00293 CBM]. The subject matter of those declarations covers virtually all subjects under the sun, at least where the sun sets on LAX.

1. **ISKCON Does Not Support its Positions with Facts that Can be Found in the Record.**

It is inexplicable (other than as an effort to hide or muddy the facts) that ISKCON's Memorandum does not cite to the voluminous records in this case or the related case. It is virtually impossible to respond to the numerous unsupported factual and legal allegations set forth in the Memorandum in the time alloted. The City directs the Court's attention to two pleadings that will be most helpful to review. These pleadings carefully and fairly address the facts relating to LAX and why Section 171.07 and, implicitly, Section 23.27(c) were enacted:

- Defendant's Memorandum of Points and Authorities in Favor of Cross-Motion for Summary Judgment, filed on November 14, 2005, in No. 2:03-CV-00293 CBM [docket number 162]. "The Statement of Facts" is found between page 4 and page 11. The memorandum goes into detail and meticulously supports each of its facts by citing to specific declarations and page numbers. Note: this Memorandum takes into consideration the facts <u>after</u> the record was supplemented as requested by the Ninth Circuit.
- Stipulation of Agreed to Statement of Facts Between ISKCON and the City of Los Angeles to be Used in Conjunction with the Cross-Motions for Summary Judgment, filed on February 10, 2006, in No. 2:03-CV-00293 CBM [docket number 266]. This 78-page document contains the facts of these cases that were agreed to by the parties—ISKCON cites to it (infrequently and imprecisely).

A few examples of ISKCON muddying the facts follow:

- ISKCON alleges that § 23.27(c) "bans plaintiffs from selling their religious literature **anywhere on the grounds of Los Angeles International Airport**

[LAX]."[2] This is nonsense, and the author of the Memorandum knows it too well. As the City has pointed out on numerous occasions, § 23.27(c) is not a complete ban. Of the parts in the bundle of rights of solicitation and receipt of funds, many remain; only the immediate receipt of funds is lost. Moreover, a solicitor may distribute literature, give away self-addressed stamped envelopes, distribute information on social networking sites and the like to encourage donations—ISKCON just cannot immediately receive funds at LAX. Also, by its own terms § 23.27(c) does not cover the "entire" airport. It covers the terminals, the parking areas and the sidewalks adjacent to them. It doesn't cover most of the 3,500-plus acres at LAX.

- What facts support the notion of the "ready availability of other solutions that would be . . . more effective" [3] than § 23.27(c) that suggests that the City's rationale is based on pretext? None are alleged because at this relatively small, busy and unique airport, the number one terrorist target in California, none exist.
- That ISKCON members may practice sankirtan is not relevant to this proceeding. The Supreme Court in *Lee* was well aware that ISKCON was practicing sankirtan, but still upheld its decision against ISKCON.

ISKCON asserts that that the activities of its six devotees do not create problems at LAX. Section 23.27(c) was adopted as a global measure to address the deleterious effects of <u>all</u> individuals who solicit and receive funds at LAX, not just ISKCON members. ISKCON seems to be critical of the City's efforts to address the problems of "other organizations,"[4] which include at any one time 15[5] organizations and 100 persons engaged in efforts at soliciting and receiving funds.[6] ISKCON's

---

[2] Memorandum at p. 1.
[3] Memorandum at p. 2.
[4] Memorandum at p. 2.
[5] Declaration of Casey Brummer (hereafter Brummer Decl.), p. 3, ¶ 11.
[6]

general position is that its members are the good guys. In the past, the City has been receptive to that position; however, one of it own members [Saul Marquez] was arrested recently[7] for violating the provisions of Section 23.27(c), even after having been previously warned that it was in effect.[8] Mr. Marquez had $700 to $800 (foreign currency was involved) in his possession,[9] including a telephone with the capability of swiping credit and debit cards.[10] According to Mr. Marquez, all of the money had been collected from airport patrons at LAX between 11:00 a.m. and 2:40 p.m. on September 28, 2010.[11] ISKCON is seeking relief only for itself; regardless, the notion that "the behavior of those [other] groups is not germane to the present motion"[12] is sophistry.

   2.   **The Equitable Relief ISKCON Seeks is not Supported by the Facts or Law.**

The primary purpose of a preliminary injunction is to preserve the status quo pending a determination of the action on its merits. *Chalk v. United States Dist. Ct., Cent. Dist. Of Calif.*, 840 F.2d 701, 704. The power of the federal courts to issue a restraining order or injunction is an extraordinary remedy, particularly when a party seeks to change the status quo, as in this instance. The Ninth Circuit has recognized that "[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo, *pendent lite*, is particularly disfavored, and should not be issued unless <u>the facts and law</u> clearly favor the moving party." *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979) (emphasis added); *see also, Stanley v. Univ. of S. Cal*, 13 F.3d 1313, 1320 (9th Cir. 1994) (noting that "[w]hen a mandatory preliminary injunction is requested, the district court should deny such relief 'unless

---

[7] Burboa Decl. p. 15, ¶ 42.
[8] Burboa Decl. p. 15-16, ¶ 43.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] Memorandum at p. 2, fn. 1.

CITY'S RESPONSE TO PLAINTIFFS' REQUEST FOR TRO
4

1  the facts and law clearly favor the moving party.'" (Citing *Anderson*). The City has
2  been enforcing Section 23.27(c) for almost three weeks now.[13]
3       In exercising their sound discretion, courts of equity "pay particular regard for
4  the public consequence in employing the extraordinary remedy of injunction."
5  *Winter v. Natural Resources Defense Council, Inc.* ___ U.S. __, 129 S.Ct. 365, 376-
6  377 (2008). The relief ISKCON is seeking appears to affect third parties.
7       ISKCON does not simply ask that the City be prohibited from enforcing an
8  ordinance that is currently in effect. Its request is more Machiavellian. It seeks the
9  court's help to: (1) allow Section 23.27(c) to continue to be enforced against its
10 competition, the 14 or so other organizations[14] that solicit and receive funds at
11 LAX;[15] and (2) allow ISKCON to cherry pick the places its wants to solicit and
12 receive funds from at LAX, including all of the sidewalks and certain locations
13 <u>inside</u> the terminals at TBIT, unencumbered by the provisions of Section 23.27(c).[16]
14 ISKCON clearly tries to mislead the court when it asserts that "[t]he record fails to
15 establish any adverse impacts of speech in the arrivals lobbies in all nine terminals,
16 the shopping areas on the on the west side of TBIT, the food court at TBIT; or the
17 outside sidewalks." (Stip. Agreed Facts ¶ 74).[17]
18      One would expect that the party requesting the court to change the status quo
19 would at least set forth the primary facts upon which it is based in a fair manner and
20 provide the court with citations to the record. ISKCON appears hopeful that this
21 court will review this case as if there were a blank slate.
22      **3.   LAX is a Nonpublic Forum and it is Not Likely that ISKCON will Prevail on the Merits**.
23      LAX is a nonpublic forum and, notwithstanding its injection of cases that
24 address issues taking place in traditional public forums, ISKCON agrees: ". . . LAX

---

[13] Declaration of Abel Burboa in Favor of City's Response to Plaintiffs' Ex Parte Application for TRO, filed October 4, 2010 (hereafter "Burboa Decl."; p. 3, ¶ 7).
[14] Burboa Decl. p. 11, ¶ 30; each of the 15 organizations has from 5 to 200 members.
[15] *See* [Proposed] Temporary Restraining Order.
[16] *Id.*
[17] Memorandum at p. 7, line 20 thru 22.

is not a public forum under federal law, *International Society for Krishna Consciousness v. Lee,* 505 U.S. 672, 683 (1992)."[18]  Since this court and the California Supreme Court have found Section 23.27(c) to be content neutral, the only question remaining is the "reasonableness" of Section 23.27(c) and whether there are some alternative modes of communication.

Section 23.27(c) is reasonable. "The reasonableness analysis focuses on whether the limitation is consistent with preserving the"[19] dedicated purpose of the property. As emphasized by the Supreme Court, "[t]he restrictions . . . need only satisfy a requirement of reasonableness. We reiterate what we stated in *Kokinda*: [it] 'need only be reasonable; it need not be the most reasonable or the only reasonable limitation.'"[20]

In a nonpublic forum, the government may restrict access based on subject matter so long as it "is not an effort to suppress the speaker's activity due to disagreement with the speaker's view. (*Lee, supra*, at p. 683.) Section 23.27(c) applies to all persons ("No person shall solicit and [immediately] receive funds inside the airport terminals at [LAX]"), [FN120] and, therefore, does not justify its restrictions based on distinctions between religious or charitable groups or on the positions, beliefs, or views of any organization. (*See*, *Sammartano v. First Judicial District Court (9th Cir. 2002) 303 F.3d 959, 970* (a courthouse was found to be a nonpublic forum).)

The purpose of § 23.27(c) is to better serve the traveling public by eliminating the incompatible aspects of face-to-face solicitation taking place in the terminals, on the sidewalks, and in the parking areas at LAX. The incompatible aspects of solicitation activities are reflected in the facts of this case, which are ratified by several federal and state cases (*Kokinda, supra*, at p. 794; *Lee*, *supra*, at pp. 733-

---

[18] Memorandum at p 8.
[19] *Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1222 (9th Cir. 2003).
[20] *Lee*, 505 U.S. 672, 683 (hereinafter *Lee*) (citing *U.S. v. Kokinda*, 497 U.S. 720, 730 (1990).

734; and *ACORN, supra,* at 1268.

As well as the voluminous evidence already on file, the City has filed additional declarations which reflect that the sidewalks and the interior buildings relating to the arrivals (lower) level have been highly and harmfully impacted by the activities of solicitors. For example:

- "I have witnessed solicitors being aggressive and intimidating towards airport patrons as they are exiting from the entry way to the TBIT building, <u>particularly on arrivals level</u> for many years. I have observed airport patrons trying to exit TBIT and have observed solicitors interfering with their ability to leave the building—for example, blocking their pathway. I have observed numerous times airport patrons being treated meanly. They have been called names when they have refused to give funds to the solicitors or they gave too small amount." Declaration of Carrie E. Sullivan, p. 2, ¶ 5.
- "During my employment with LAWA PD I have been involved in approximately 1,300 arrests and investigations that have involved the interaction of solicitors and airport patrons. I have personally made, and have assisted in numerous arrests relating to improper solicitation activities at LAX." Decl. Carey Brummer, p. 3, ¶ 10.
- "The Court's decision was a big help in preventing solicitation and receipt of funds <u>inside the terminals</u> (including TBIT); their presence, however, in the designated areas is still an inconvenient distraction form TBIT operations. However, after a period of time, those solicitors, and others, merely <u>stepped outside</u> and are now on the sidewalks in front of the terminals." Decl. of Vijay Sundaram, p. 3, ¶ 4.
- "Dealing with the problems associated with individuals soliciting and receiving funds at LAX has, indeed, been difficult. Their *modus operandi*, at least of those who are essentially in competition for the people that we are

trying to help (i.e., those solicitors who dress similarly to Ambassadors, hold clipboards and badges up in the air, shout to members of the traveling public to get their attention and then intimidate passengers into giving them a substantial donation) involve tactics that are misleading and intimidating. I have seen all of the tricks and the terrible consequences of their activities. For example, when six or seven solicitors stand outside on the sidewalks in front of the terminals and stop people from coming out, the people who try to get out of the terminal get bogged down. Moreover, this backing up process creates such crowds that the passengers who need help are unable to see us who are inside of the terminals. Once they get outside they are pounced on by the solicitors. I will not go into them right now because their adverse activities are well known throughout the LAX community." Decl. of Turkan Ymeri, p. 2-3, ¶ 5.

- "In conjunction with performing our duties we frequently observe and come in contact with solicitors. Even when solicitors are confined to the designated areas inside the terminals, problems arise. More often than not the solicitors shout at passengers from the designated areas and more often than not they roam into and among the pedestrian traffic where they are not supposed to be. This creates conflicts with pedestrians." Decl. of Robert Ewald, p. 3, ¶ 4.
- "Through my years of observations of solicitors I have concluded that they, in many instances, act like astute businessmen. They are familiar with the airline schedules and move their members to those terminals and doors where they know that there will be more passengers. Seeking passengers is what it is all about. It seems to me that the various groups of solicitors divide up the airport in to certain territories, presumably not wanting to conflict with one another. Some stay in T-3, others are always near T-2." Decl. of Robert Ewald, p. 3, ¶5.
- "Not all solicitors are alike; for example, there are generally the following

CITY'S RESPONSE TO PLAINTIFFS' REQUEST FOR TRO

8

types of solicitors: (a) Information Solicitors—we have information for you, now give us a $20 donation because we helped you out; (b) Pamphlet Solicitors—look at my pamphlet of injured or maimed people—please help our cause out; (c) Hare Krishnas—look at our religious books and pamphlets; please give me $20 for the book; it's not much; (d) Nurses in White—they stand in the same location every day with a bucket into which they hope for donations; Veterans Groups—please help out the soldiers." Decl. of Robert Ewald, p.3, ¶ 7.

Section 23.27(c) (1) will help reduce fraud; (2) will reduce pedestrian congestion exacerbated by solicitation activities; (3) will help diminish conflicts between solicitors and members of the traveling public who constitute a captive audience; and (4) will help contribute to a more effective police force, one not distracted by solicitation activities and thus able to focus more of its attention on protecting airport patrons from potential terrorist activity.

The facts supporting the reasonableness of § 23.27(c) are more powerful than those in *Lee, supra*. The airport environs in *Lee* contained numerous eating establishments and retail facilities, and still *Lee* upheld a ban of the immediate solicitation of funds in the terminals at JFK. Security matters were not addressed. The ordinance involved in *ISKCON v. Miami, supra*, went further; it banned the solicitation activities in the terminals, sidewalks, and parking areas. *ISKCON v. Miami, supra*, concluded that "the regulations prohibiting solicitation and sales anywhere on airport property constitute a reasonable restriction in the context of the particular nature and purpose of MIA"). (*Id*. at 1289.)

**CONCLUSION**

If LAX were an entertainment center, its background music would be labeled cacophonous. Yet within this dissonance, the City has a huge responsibility: to protect members of the traveling public, who in this age of apprehension are largely

captive audiences. The protection it can offer, indeed what it must offer, comes in many forms: safety, security, convenience, and efficiency. But to get there, the City must adopt rules, regulations, and laws that can come into conflict with a number of individuals, including those wishing to exercise free speech rights, like ISKCON.

After 13 years, Section 23.27(c)—unanimously held by the California Supreme Court as valid under the California Constitution—has finally been in effect just short of 3 weeks. The elation by those who work in the airport on a daily basis is a story in itself. The City is of the view that it would not be good public policy to re-impose any form of restraint on the City's ability to enforce Section 23.27(c). If balancing the equities is necessary, the court should rule on the side of those dedicated employees at LAX who would be disappointed,[21] sad,[22] discouraged and lose faith in the system.[23] In any event, the relief ISKCON seeks is not supported by the facts and, essentially, amounts to granting it territorial control at LAX.

As Gina Marie Lindsey, executive director of Los Angeles World Airports, recently stated: "This [the dissolution of the injunction] is a huge step forward in ensuring the comfort and safety of the traveling public at LAX. From now on, the traveling public will not have to worry about solicitors asking for money." "The solicitors were the number one passenger complaint".[24]

Dated: October 4, 2010	Respectfully Submitted,

OFFICE OF CITY ATTORNEY, LOS ANGELES

LAW OFFICES OF JOHN M. WERLICH


By:  /s/JOHN M. WERLICH

John M. Werlich

Attorneys for Defendants, City of Los Angeles, et al

---

[21] Decl. of Ewald, p. 4, ¶ 10.
[22] Decl. of Sullivan, p4, ¶ 13.
[23] Decl. of Sundaram, p\64, ¶ 11.
[24] Decl. of Burboa, p. 18, ¶ 50.